Both plaintiff's and defendant's attorneys, through their clerks, asked the court to mark the case "Ready and passed for the day." Sufficient reason not having been shown to the court for granting the adjournment, as requested, it was refused, and the case set down for trial for the May term, 1918. I think that, while the court had the right to deny the application for the delay applied for, yet it was without authority to postpone the time of trial to a term two years distant. Rule 14 of the Rules of the City Court. The order should be reversed, and the motion to restore to the day calendar granted.

Order reversed, with $10 costs and disbursements and motion to restore case to the day calendar granted. All concur.

(174 App. Div. 813)

## BEACH v. JENKINS.

(Supreme Court, Appellate Division, Fourth Department. May 24, 1916.)

1. COVENANTS ⬳79(3)—BUILDING RESTRICTIONS—"ADJACENT."

In deeds from a common grantor of lots in a residence tract, provisions for a 20-foot house building line, and that the grantee and assigns should not use the premises for "purposes which shall render adjacent premises undesirable for residence," that they "covenant" to observe the restrictions, and that no barn or stable shall be erected within 50 feet of the street, were regarded in the nature of covenants, meant for the common advantage of purchasers, since one of the usual definitions of "adjacent" is "neighboring," or in the narrowest meaning "bordering on," even although in a few of the deeds the house building line was fixed at 15 feet, and although as to 20 of these lots there were no restrictions, since they may have been conveyed with verbal restrictions which would be valid and binding; no building on the whole tract in fact having been built within the 20-foot line.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 78; Dec. Dig. ⬳79(3).

For other definitions, see Words and Phrases, First and Second Series, Adjacent.]

2. COVENANTS ⬳81—BUILDING RESTRICTIONS—PERSONS ENTITLED TO ENFORCE.

Although there is neither privity of estate nor privity of contract between adjoining lot owners holding under such covenants, equity will afford relief to one owner against another, or his grantee, violating them, since such grantee is charged with notice thereof.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 87; Dec. Dig. ⬳81.]

3. COVENANTS ⬳51(2)—BUILDING RESTRICTIONS—"FRONT LINE."

Under such covenant not to build within a certain distance of the "front line" of the premises, in case of a lot 60 feet on one street and 120 on another, the "front line" is not deemed that only on the first street, but on both streets, at least where the buildings on the second street are uniformly set back such a distance.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 50; Dec. Dig. ⬳51(2).

For other definitions, see Words and Phrases, First and Second Series, Front.]

4. COVENANTS ☞51(2)—BUILDING RESTRICTIONS—"BARN"—"STABLE."

Under such covenants, the construction of a garage is governed by the restriction as to a "barn" or "stable," since the objectionable features of odor, noise, and danger of fire are the same.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 50; Dec. Dig. ☞51(2).

For other definitions, see Words and Phrases, First and Second Series, Barn; Stable.]

Appeal from Equity Term, Onondaga County.

Suit by George B. Beach against Emma Jenkins. From a judgment for plaintiff, defendant appeals. Affirmed.

The opinion of De Angelis, J., at Equity Term, is as follows:

The plaintiff seeks an injunction requiring the defendant to remove her garage from its present location on the defendant's land and perpetually restraining the defendant from constructing or maintaining a garage in that location, on the ground that the defendant, by reason of a negative or restrictive covenant, or the equivalent thereof, is forbidden to have or maintain a garage in its present location. The defendant contends that she is subject to no such restriction and has a right to maintain the garage where it is.

The defendant owns two adjoining lots in Syracuse bounded northerly by Tallman street and Onondaga avenue, easterly by Coolidge avenue, and southerly and westerly by plaintiff's lot and Onondaga avenue. The original deed of defendant's lots was executed by Manning C. Palmer and wife and Alva Palmer and wife to Arthur Jenkins, was dated July 29, 1896, recorded August 3, 1896, and the lots were described therein as follows: "All that tract or parcel of land situate in the city of Syracuse, Onondaga county, New York, known as lots Nos. one and two (1 and 2) of block No. three hundred thirty-five (335) of the Palmer Tract in said city, according to an amended map of said tract made by Clarke, Meacher & Allen, C. E., and filed in the Onondaga county clerk's office on the 22d day of December, 1891, said lots being described as follows: Beginning at a point in the west line of Coolidge avenue, one hundred twenty-six and 90/100 (126.90) feet southerly of the intersection of said west line of Coolidge avenue with the south line of Tallman street; thence northerly along the west line of Coolidge avenue one hundred and twenty-six and 90/100 feet to the intersection of the west line of Coolidge avenue with the south line of Tallman street; thence along the south line of Tallman street sixty (60) feet to the northwest corner of lot No. one aforesaid; thence along the south line of Tallman street in a line curving towards Onondaga avenue, eighty-four and 60/100 (84.60) feet to the northwest corner of lot No. 2 aforesaid; thence southeasterly along the southwest side of lot No. 2 one hundred twenty-nine and 6/10 (129.6) feet to a point one hundred twenty-one and 68/100 (121.68) feet south of the northwest corner of said lot No. 1; thence easterly to the place of beginning." This deed contains the following provision: "Provided, nevertheless, and the grant hereby made is subject to the following restrictions and conditions, viz.: That the said grantee, his heirs, assigns, and licensees shall never sell any intoxicating liquors on said premises, or any part thereof, or erect any building thereon less than two stories high or without a stone foundation, or less than fifteen feet from the front line of said premises, or use said premises for manufacturing, trade or other purposes, which shall render adjacent premises undesirable for residence; and the grantee for himself and his heirs and assigns covenant that they will observe the said restrictions and conditions, and further that no barn or stable shall be erected on said premises within (50) fifty feet of Coolidge avenue." Arthur Jenkins deeded these lots to his wife, the defendant, by quitclaim deed dated December 28, 1900, which deed was recorded December 28, 1900, and contained no restrictions whatever and no reference to the deed from the Palmers to Arthur Jenkins.

The plaintiff owns a lot adjoining the defendant's two lots, bounded northerly by defendant's lots, easterly by Coolidge avenue, southerly by the

lot of one Mary A. Snow, and westerly by Onondaga avenue. The original deed of plaintiff's lot given by the Palmers to Anna E. Gray was dated July 13, 1895, and recorded September 14, 1895. It conveyed lot No. 3 in block 335, and referred to the Palmer map in the same manner as the same was referred to in the deed from the Palmers of the defendant's lots, and contained this restrictive provision: "Provided, nevertheless, and the grant hereby made is subject to the following restrictions and conditions, viz.: That the said grantee, her heirs, assigns, and licensees, shall never sell any intoxicating liquors on said premises, or any part thereof, or erect any building thereon less than two stories high or without a stone foundation, or less than twenty feet from the front line of said premises on either street, or use said premises for manufacturing, trade or other purposes, which shall render adjacent premises undesirable for residence, and upon the further condition that no barn shall be erected upon said premises within fifty feet of Coolidge avenue." The plaintiff holds this lot through two mesne conveyances with the same restrictions from Anna E. Gray.

This figure represents the location of the plaintiff's and defendant's lots, with the measurements thereof, and the location of the defendant's house and garage: [See Map, Exhibit 2.]

It is admitted in the pleadings that in the year 1891, and prior thereto, Manning C. Palmer and Alva W. Palmer were the owners in fee of a certain large tract of land situated in the westerly part of the city of Syracuse, located at and near the junction of Onondaga avenue and Tallman street, known as the Palmer Tract, and that Manning C. Palmer and Alva W. Palmer caused this tract to be laid out and divided into building lots for the purpose of sale and caused maps of the same so divided and laid out to be filed in the office of the clerk of Onondaga county, which maps are now on file in that office in Book No. 4 of Maps as No. 628 and in Book No. 5 of Maps as No. 714. The pleadings further admit that the Palmer Tract was at the time the maps were made and still is situated in and near and forms a part of a high-grade residential section of the city, where there were then existing and in process and contemplation of erection valuable high-grade dwelling houses, and that that section and vicinity have ever since continued to increase in value for residential purposes; many high-grade dwelling houses having been erected upon lots of the tract along the various streets intersecting and bounding the tract and near or adjoining the property of the plaintiff and defendant. The pleadings further admit that the Palmers, after making and filing the maps, and before and after the purchase by the plaintiff and defendant of their lots, sold a number of lots on Onondaga avenue, Tallman street and Coolidge avenue.

The evidence does not definitely disclose the extent of the Palmer Tract, but one of the maps introduced in evidence shows the tract to be in the form nearly of a parallelogram, about 1,900 feet in length and about 900 feet in width; the longer way being north and south. It is bounded on the north by Tallman street, on the east by Rich street, on the south by Cheney street, and on the west by Onondaga avenue. There are two streets between Rich street and Onondaga avenue, substantially parallel thereto, and extending the whole length of the tract, to wit, Palmer avenue and Coolidge avenue. There are two streets between Tallman street and Cheney street, and parallel thereto, which run clear across the tract, to wit, Bellevue avenue and Solvay street. This map shows that the tract was divided into 10 blocks, to wit, Nos. 335, 336, 337, 338, 340, 341, 342, 343, 344, and 345, and about 250 lots averaging about 40 feet in width and 120 feet in depth. Residences have been built on about 200 lots and there is no business place, boarding house, saloon, or the like on the tract. There is no proof that there is any building within 20 feet of any street line in the tract, except the garage in question.

As already appears, plaintiff's lot is No. 3 and defendant's lots are Nos. 1 and 2, in block No. 335 of the Palmer Tract. This block is bounded northerly by Onondaga avenue and Tallman street, easterly by Coolidge avenue, southerly by Bellevue avenue, and westerly by Onondaga avenue. Block No. 336, the block in the tract next easterly, is bounded northerly by Tallman street, easterly by Palmer avenue, southerly by Bellevue avenue, and westerly by Coolidge avenue, so that Coolidge avenue separates the two blocks. It is

undisputed that the buildings on both sides of Coolidge avenue in this territory are uniformly 20 feet back from the street lines on both sides, with the sole exception of the garage in question. The situation includes the four corner lots, which according to defendant's contention do not appear to front on Coolidge avenue. Every lot except the plaintiff's is built upon.

On the 29th day of July, 1896, when the Palmers deeded lots Nos. 1 and 2 to Arthur Jenkins, lots Nos. 3, 4, 5, 6, 8, and 11 in block No. 335, on the westerly side of Coolidge avenue, and lots Nos. 6, 11, 13, 17, 21, and 25 in block No. 336, on the easterly side of Coolidge avenue, had been sold and conveyed by the Palmers. On the 28th day of December, 1900, when the defendant acquired title to lots Nos. 1 and 2 from her husband, lots Nos. 9, 10, 11, and 12 in block No. 335, on the westerly side of Coolidge avenue, and lots Nos. 1 and 15 in block No 336, on the easterly side of Coolidge avenue, had also been sold and conveyed by the Palmers.

[1] The restrictive provisions in the conveyances of these lots from the Palmers are fairly to be regarded as in the nature of covenants. Avery v. N. Y. C. & H. R. R. Co., 106 N. Y. 142, 154, 155, 12 N. E. 619; Post v. Weil, 115 N. Y. 361, 22 N. E. 145, 5 L. R. A. 422, 12 Am. St. Rep. 809. Calling these restrictive provisions restrictive covenants for convenience, however they should be denominated in strict legal terminology, and assuming that by themselves and considered alone they only bound the grantees, in view of the facts above set forth, I think it may be fairly said that these covenants come within the first class designated by the Court of Appeals in Korn v. Campbell, 192 N. Y. 490, 495, 85 N. E. 687, 689, 37 L. R. A. (N. S.) 1, 127 Am. St. Rep. 925, there characterized as "those which are entered into with the design to carry out a general scheme for the improvement or development of real property." This class is defined as follows: "This class embraces all the various plans generally denominated in the English cases as building schemes, under which an owner of a large plot or tract of land divides it into building lots, to be sold to different purchasers for separate occupancy, by deeds which contain uniform covenants restricting the use which the several grantees may make of their premises. In such cases the covenant is enforceable by any grantee as against any other upon the theory that there is a mutuality of covenant and consideration, which binds each and gives to each the appropriate remedy. Such covenants are entered into by the grantees for their mutual protection and benefit, and the consideration therefor lies in the fact that the diminution in the value of a lot burdened with restrictions is partly or wholly offset by the enhancement in its value due to similar restrictions upon all the other lots in the same tract."

The language of Wills, J., in Nottingham Patent Brick & Tile Co. v. Butler, 15 Queen's Bench Division, 261, 268, seems to me pertinent: "The principle which appears to be deducible from the cases is that, where the same vendor, selling to several persons plots of land, parts of a larger property, exacts from each of them covenants imposing restrictions on the use of the plots sold without putting himself under any corresponding obligation, it is a question of fact whether the restrictions are merely matters of agreement between the vendor himself and his vendees, imposed for his own benefit and protection, or are meant by him and understood by the buyers to be for the common advantage of the several purchasers. If the restrictive covenants are simply for the benefit of the vendor, purchasers of other plots of land from the vendor cannot claim to take advantage of them. If they are meant for the common advantage of a set of purchasers, such purchasers and their assigns may enforce them inter se for their own benefit." The judgment in this case was affirmed in the Court of Appeal, and is reported in 16 Queen's Bench Division at page 778.

The circumstances in the case at bar are somewhat different from those in the case referred to; still I think they are such as to justify me in finding, and I do find, that the restrictive covenants in the conveyances from the Palmers were meant for the common advantage of the purchasers. There is, however, an additional and convincing reason to show that the Palmers meant these covenants to be for the common advantage of the purchasers, in these particular words in the restrictive provisions, to wit, "which shall render adjacent premises undesirable for residence." While these words undoubtedly

limit or amplify the preceding words, "or use said premises for manufacturing, trade or other purposes," still in them there was afforded and adopted an opportunity to point out and indicate the general purpose of the restrictions. The expression "adjacent premises" does not necessarily refer to lots that touch each other, but one of the usual definitions of "adjacent" is "neighboring." Here certainly we have presented a sufficient basis to say that these restrictions are and were designed to be mutual and for the benefit of the owners of lots in the tract sold and to have been sold.

But it is argued that there could be no general scheme on the part of the owners of the tract of land to prohibit the construction of buildings within 20 feet of the lines of streets, because the limit was fixed at 15 feet in a few conveyances. These few exceptions where the space is fixed at 15 feet are not enough to invalidate the general scheme. It is also argued that, because there are no restrictions in the conveyances by which the Palmers conveyed lot No. 17 in block No. 335, and lots Nos. 9, 10, 14, 16, 18, 19, 20, 22, 23, 24, 26, 27, 28, 30, 31, 32, 33, 34, and 35 in block No. 336, it cannot be held that there was a general scheme for prohibiting the construction of buildings in the space 20 feet from the street lines. It will be remembered that there are about 250 lots in all, and it cannot be successfully contended that, because the conveyances of 20 of these lots contained no restrictions, there was no general scheme for that purpose. Nineteen of these 20 lots were conveyed by one deed to Onondaga Park Land Company, dated May 6, 1903. The name of this grantee indicates nothing in hostility to the residential scheme. Moreover, these lots may have been conveyed with verbal restrictions of the same kind as those appearing in the other conveyances, and such restrictions would be valid and binding. Tallmadge v. East River Bank, 26 N. Y. 105. In this connection it may be recalled as a corroborative circumstance that it does not appear that any building on the whole tract is within 20 feet of a street line except the defendant's garage.

There is another view to take of the relative rights of the parties, and this view is confined to a consideration of the conveyances of lots Nos. 1 and 2, the defendant's lots, lot No. 3, the plaintiff's lot, and lot No. 4, the Snow lot. The Palmers conveyed lot No. 4 to Mary A. Snow by deed dated May 31, 1893, which was recorded June 5, 1893; lot No. 3 to Anna E. Gray by deed dated July 13, 1895, which was recorded September 14, 1895; and lots Nos. 1 and 2 to Arthur Jenkins by deed dated July 29, 1896, which was recorded August 3, 1896. The Snow deed was the first conveyance, the Gray deed was the next, and the Jenkins deed the last. The Snow deed contained the same restrictions as the Gray deed, which appear in the foregoing, and the restrictions in the Jenkins deed also appear in the foregoing. As already shown, the prohibitive words, "which shall render adjacent premises undesirable for residence," indicate clearly that the restrictions in each of the deeds were for the benefit of "adjacent premises." The narrowest meaning of the word "adjacent" is "bordering on." Lot No. 3, the plaintiff's lot, borders on lots Nos. 1 and 2, the defendant's lots, and lot No. 4, the Snow lot. Lots Nos. 1 and 2 also border on lot No. 3. When lots Nos. 1 and 2 were conveyed to Arthur Jenkins, the restrictions against building within "15 feet from the front line of said premises," and providing that no barn or stable should be erected on the premises within 50 feet of Coolidge avenue, were inserted in the conveyance to him for the benefit of the property bordering on lots Nos. 1 and 2, to wit, lot No. 3, the plaintiff's lot.

This brings the plaintiff's case within the class referred to by the Court of Appeals in Equitable Life Assurance Society v. Brennan, 148 N. Y. 661, 672, 43 N. E. 173, 176, described as follows: "There is a class of cases where the covenant, by fair interpretation of its language, is not exclusively for the benefit of the grantor, but of other property owners in the immediate vicinity."

[2] The restrictions in the deed to Arthur Jenkins, of which the defendant had notice, were made clearly for the benefit of the premises owned by the plaintiff, and, although there is neither privity of estate nor privity of contract between the plaintiff and defendant, equity will afford the plaintiff relief where the defendant violates the restrictions. Although the title of the plaintiff and that of the defendant come from a common source, it is argued that, because the plaintiff's premises were conveyed first, he can claim noth-

ing by reason of the restrictions in the later conveyance of the defendant's premises. But the answer to that argument is that the restrictions in the deed to the defendant's grantor were made for the benefit of the plaintiff's premises. This proposition is expressly held in Barrow v. Richard, 8 Paige, chs. 351, 360, 35 Am. Dec. 713, and Brouwer v. Jones, 23 Barb. 153, 160, 161. As the defendant obtained her lots from Arthur Jenkins, her husband, she is chargeable with notice of the restrictions contained in the deed to him. Williamson v. Brown, 15 N. Y. 354; Cambridge Valley Bank v. Delano, 48 N. Y. 326; Anderson v. Blood, 152 N. Y. 285, 293, 46 N. E. 493, 57 Am. St. Rep. 515; Kingsland v. Fuller, 157 N. Y. 507, 511, 52 N. E. 562; Wilson v. Ford, 209 N. Y. 186, 200, 102 N. E. 614.

The answer also contains this admission: "Defendant further admits that she had notice of the alleged restrictive plan of said Palmers." I think, therefore, that it is reasonably clear that the plaintiff may maintain this action, if the garage was built in violation of the restrictions.

[3] The defendant contends that lot 1, upon which the garage was constructed, fronts on Tallman street, and that the garage is more than 15 feet from "the front line of said premises." As lot No. 1 is bounded on the north by Tallman street and on the east by Coolidge avenue, the only basis for saying that the lot fronts on Tallman street is the fact that, as laid out, the lot is 60 feet on Tallman street and 126 $90/100$ feet on Coolidge avenue. To carry out the scheme of the Palmers, no building should have been erected within 15 feet of the line of Coolidge avenue, and as the language, "the front line of said premises," would have been appropriate to describe the entire boundary of the two lots, since that boundary was on three streets, it was fairly within usage to regard the entire street line as "the front line of the premises." The two lots, Nos. 1 and 2, were conveyed together as one lot, and as one lot there is a frontage on Coolidge avenue, Tallman street, and Onondaga avenue. Who shall say that one of these streets rather than another is the front line of the premises? Is it not better to say that the front line is on all the streets? An affirmative answer will uphold the residential scheme. A negative answer will seriously mar the scheme. The affirmative is supported by authority. Justices of Bedfordshire v. Bedford, 7 Exch. 658; Des Moines v. Dorr, 31 Iowa, 89, 93.

Assuming, however, that the expression "front line" may be ambiguous, I think that the condition of Coolidge avenue, with the buildings uniformly back from the line of the street at least 20 feet, together with the restrictions in her grantor's deed, was sufficient to put the defendant upon the inquiry, and as the result of that inquiry she was bound to take notice of the restrictions by which the open space in front of the buildings was to be maintained on Coolidge avenue and she was bound to conform to those restrictions. Indeed, she would have been bound so to conform if the deed to her grantor contained no restrictions, for, it appearing that the scheme was once formed and its execution entered upon, the Palmers had no right to abandon it without the consent of those for whose benefit it was established, and every grantee of a lot with notice was obligated to conform to the scheme.

[4] From the foregoing it must be apparent that the restriction against building a barn or stable within 50 feet of Coolidge avenue contained in the defendant's grantor's deed was binding upon the defendant. The question then arises as to whether the construction of this garage violated that restriction. A garage is a structure having many things in common with a stable. The objectionable features about a stable are the odor, the noise, and the danger of fire. The objectionable features about the garage are the same. The Century Dictionary defines a garage as "a stable for motor cars." I think the building of this garage violated the barn or stable restriction.

Generally speaking, it seems to me it was ill-advised for the defendant to construct her garage in the place chosen by her, in every view of the situation. She had full notice of the claim of the owners of property on Coolidge avenue challenging her right so to locate the garage before its construction was begun, and she deliberately took the chance that the claim of her neighbors might be vindicated. I think the plaintiff is entitled to an injunction requir-

ing the removal of the garage and perpetually restraining the defendant from constructing a garage within 50 feet of the westerly line of Coolidge avenue Formal findings in accord herewith may be submitted by the plaintiff.

Argued before KRUSE, P. J., and FOOTE, LAMBERT, and MERRELL, JJ.

Hitchcock & Murphy, of Syracuse, for appellant.
Nash, Britcher & Eckel, of Syracuse, for respondent.

PER CURIAM. Judgment affirmed, with costs, upon the opinion of De Angelis, J., delivered at Equity Term.

---

McGUIRE v. PRENDERGAST, City Comptroller.

(Supreme Court, Special Term, New York County. May 20, 1915.)

1. MUNICIPAL CORPORATIONS ⟨⟩162(3)—OFFICERS—SERVICES OUTSIDE OF DUTIES—COMPENSATION—STATUTE.
   Under Greater New York Charter (Laws 1901, c. 466) § 1533, prohibiting any alderman or other officer of the corporation from becoming interested as contracting party or otherwise in the performance of any contract or work, the expense of which is payable from the city treasury, a visiting physician at the city prison, acting under the commissioner of correction and receiving an annual salary and having regular office hours, whose position was not specifically provided by law, and who had not taken the oath of office provided by Public Officer's Law (Consol. Laws, c. 47) § 10, nor the oath specified by section 1548 of the charter, who testified as an expert before commissioners appointed by judges of the Court of General Sessions to examine and report as to the sanity of defendants under indictment, who had pleaded insanity, might recover the fees fixed by such judges against the city, as such payment violated neither the letter nor the spirit of the charter, especially in view of the comptroller's course in making payments for such services.

   [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 360; Dec. Dig. ⟨⟩162(3).]

2. MUNICIPAL CORPORATIONS ⟨⟩891—VISITING PHYSICIAN—FUNDS FOR PAYMENT—EXHAUSTION.
   Code Cr. Proc. § 658, provides that when a defendant pleads insanity the court may appoint a commission to examine him and report as to his sanity, with power to call and examine witnesses; section 662a makes the costs of a commission of lunacy a charge upon the county in which it is executed; Greater New York Charter (Laws 1901, c. 466) § 1542, provides that the heads of departments, etc., charged with incurring obligations out of moneys raised by tax in the city, or the counties within its limits, shall see that such expenditures shall not exceed the amount annually appropriated therefor, and that no charge shall exist for any sum in excess of the appropriation therefor; and section 188, subd. 7, authorizes the comptroller to issue certificate of indebtedness for the payment of claims lawfully payable by the city and the several counties within its limits, for which no other provision has been made; and section 230, subd. 6, requires the board of estimate to annually include appropriations for county, as distinguished from city, expenses. *Held*, that the commissioners had power to call expert witnesses and that the mere fact that an appropriation for disbursements under section 658

---

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes